*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0281P (6th Cir.)
File Name: 03a0281p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*             No. 02-1426

ALI BOUMELHEM,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-81013—George C. Steeh, District Judge.

Argued: June 18, 2003

Decided and Filed: August 12, 2003

Before: NORRIS, DAUGHTREY, and ROGERS, Circuit
Judges.

─────────────

## COUNSEL

**ARGUED:** Pierre H. Bergeron, SQUIRE, SANDERS &
DEMPSEY, Cincinnati, Ohio, for Appellant. Robert Cares,
UNITED STATES ATTORNEY, Detroit, Michigan, for
Appellee. **ON BRIEF:** Pierre H. Bergeron, SQUIRE,
SANDERS & DEMPSEY, Cincinnati, Ohio, for Appellant.

Robert Cares, UNITED STATES ATTORNEY, Detroit,
Michigan, for Appellee.

─────────────

## OPINION

─────────────

ROGERS, Circuit Judge. Ali Boumelhem was convicted
of five violations of, and one count of conspiracy to violate,
18 U.S.C. § 922(g), which (subject to jurisdictional
limitations) prohibits the possession or shipment of firearms
or ammunition by a person who has previously been
convicted of a crime punishable by imprisonment for over one
year. Boumelhem was at the same time convicted of one
count of conspiracy to violate 18 U.S.C. § 922(e), which
prohibits the delivery of firearms and ammunition to a
common carrier for shipment in foreign commerce without
written notice to the carrier in violation of 18 U.S.C. § 922(e).
Boumelhem appeals his convictions and sentence, asserting
that (1) the Fourth Amendment was violated by the
government's search of the cargo container in which many of
the prohibited articles were found, (2) the previous crime
upon which his § 922(g) convictions were based was not a "a
crime punishable by imprisonment for a term exceeding one
year," and (3) the district court improperly applied a four-
point sentencing enhancement for possessing firearms "in
connection with another felony offense" under USSG
§ 2K2.1(b)(5). While we conclude that the search was
reasonable and that Boumelhem's prior conviction was a
proper predicate offense under § 922(g), the district court
erred by enhancing Boumelhem's sentence under USSG
§ 2K2.1(b)(5). We therefore affirm Boumelhem's
convictions but vacate his sentence and remand to the district
court for re-sentencing.

### FACTS

In late October of 2001 a joint task force, formed to combat terrorism, began to investigate whether Ali Boumelhem ("Boumelhem") and his brother, Fouad Boumelhem ("Fouad"), were attempting to ship weapons to Lebanon. The Federal Bureau of Investigation (FBI), the United States Customs Service (Customs), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the United States Immigration and Naturalization Service (now the Bureau of Citizenship and Immigration Services), and the United States Commerce Department participated in this particular investigation, but the task force also included the United States Secret Service and the Michigan State Police. The investigation focused on a forty-foot-long shipping container that Vantage International delivered to Trumbell Auto Repair, a business owned by Fouad, in late October 2001.

Vantage International is an international freight forwarding business operated by Mustafa Khalifa. Both Fouad and Boumelhem discussed arrangements to ship automobile engines, transmissions and related parts with Khalifa, but Khalifa was never informed that firearms and ammunition were going to be shipped to Lebanon. Based upon the information he was provided, Khalifa filled out the necessary paperwork, including a bill of lading, which listed the contents of the container as "40 engines, used, and other salvage auto parts," and a shipper export declaration, which detailed the contents as "engines and transmissions." The bill of lading listed Boumelhem as the consignee of the shipment.

After the container was delivered, Fouad and Boumelhem, with the help of others, loaded the container, during which time the FBI kept both the container and Boumelhem under surveillance. On November 6, 2000, a truck transported the loaded container to a railroad yard in the Detroit area. The container was scheduled to be transported from the yard to Montreal, Canada, and from there shipped to Lebanon. Once the container reached the railroad yard, Customs agents had

the container taken to a nearby Customs facility, where it was searched. Although Customs agents initiated the search, other law enforcement agents, including FBI agents, participated in the search.

The search revealed a number of items not disclosed by the bill of lading or the shipper's export declaration. Customs agents discovered, hidden in a car door, (1) twelve boxes of nine millimeter ammunition, (2) three boxes of 7.65 millimeter ammunition, (3) a Remington twelve-gauge shotgun, (4) an upper receiver for an M-16 or AR-15 assault rifle, (5) hand grips for the barrel of an AR-15, (6) flash suppressors, (7) a butt stock assembly for an M-16 or AR-15, (8) and some speed loaders. Custom agents also discovered another twelve-gauge shotgun , along with a two-way radio, in a shopping bag that had been wrapped in a shirt. Based upon this evidence, Boumelhem was later arrested.

At trial, the government presented testimony from Alan Stark, a firearms dealer. Stark testified that Boumelhem purchased four twelve-gauge shotguns during a period beginning in 1996 and ending in 1998.

In a fourth superseding indictment, Boumelhem was charged with (1) one count of possessing firearms and ammunition in violation of 18 U.S.C. § 922(g), (2) four counts of possessing a firearm in violation of § 922(g), (3) one count of conspiracy to ship firearms and ammunition in foreign commerce in violation of § 922(g), and (4) one count of conspiracy to deliver firearms and ammunition to a common carrier for shipment in foreign commerce without written notice to the carrier in violation of 18 U.S.C. § 922(e). An individual violates § 922(g) only if the individual has previously been convicted for "a crime punishable by imprisonment for a term exceeding one year." To meet this requirement, the government relied on Boumelhem's 1993 conviction of one count of grand theft in California; the Los Angeles Municipal Court had sentenced Boumelhem to felony probation, with the condition that he spend six days in

the county jail. After trial, a jury convicted Boumelhem on all seven federal counts. At Boumelhem's sentencing hearing, the government sought, and was granted, a four-point enhancement under USSG § 2K2.1(b)(5), for possessing firearms "in connection with another felony offense." Boumelhem was then sentenced to incarceration for forty-four months. Boumelhem now appeals his conviction and sentence.

## ANALYSIS

### I. *The Search of the Shipping Container Did Not Violate the Fourth Amendment.*

Boumelhem contends that the search of the shipping container violated his rights under the Fourth Amendment. Boumelhem makes two arguments in support of his Fourth Amendment contention. First, he argues that—in contrast to border searches of imports—border searches involving the *export* of cargo, other than currency, should be subject to a probable cause or reasonable suspicion standard. Boumelhem also maintains that even if Customs possesses the ability to conduct export searches without reasonable suspicion, the search of the container violated the Fourth Amendment because Customs undertook the search at the direction of the FBI. The FBI, Boumelhem argues, should not be allowed to circumvent the requirements of the Fourth Amendment by employing Customs to search a container that is the target of an FBI investigation. We reject both arguments and conclude that the search was reasonable.

### A. Standard of Review

"'On suppression issues, [an appellate court] review[s] a district court's findings of fact for clear error, but . . . review[s] all conclusions of law de novo.'" *United States v. Haynes*, 301 F.3d 669, 676 (6th Cir. 2002) (quoting *United States v. Crowder*, 62 F.3d 782, 785 (6th Cir.1995)). In reviewing such a decision, the court must consider the evidence in the light most favorable to the government. *Id*.

### B. The Warrantless Exit Search was Authorized by Statute and Permitted by the Fourth Amendment.

Boumelhem argues that the search of the cargo container was not justified because the government failed to obtain a warrant. The Supreme Court has held, however, that warrants are not required for border searches of materials or persons. *United States v. Ramsey*, 431 U.S. 606, 619 (1977). Boumelhem argues that the Supreme Court's border search cases do not apply to searches of articles leaving the country. He also argues in the alternative that the government agents who conducted the search were not authorized by statute to conduct the search. We conclude that the exit border search was both authorized by statute and constitutional. Following the lead of *United States v. Ramsey*, 431 U.S. at 606, we address first whether the border search was authorized by federal statute and then analyze the search under traditional Fourth Amendment principles.

#### 1. The Customs Agents Were Statutorily Authorized to Conduct the Export Search.

Contrary to Boumelhem's arguments, here the Government agents had statutory authority to conduct the search of the

cargo container.[1] Section 1581 of Title 19 of the United States Code, in pertinent part, reads:

> Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States . . . without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

19 U.S.C. § 1581(a). This statute has been interpreted as granting general authorization for border searches. *See United States v. Molina-Tarazon*, 279 F.3d 709, 712 n.4 (9th Cir. 2002) ("The border search exception is codified at 19 U.S.C. § 1581(a). . . ."); *United States v. 1903 Obscene Magazines*, 907 F.2d 1338, 1341 (2d Cir. 1990) (citing §1581 for the proposition that Customs "has plenary power to safeguard the United States borders, which includes the power to inspect any person or thing that presents itself at a border seeking entrance"); *United States v. Glasser*, 750 F.2d 1197, 1204 (3d Cir. 1984) (finding that §1581 is the "general border search statute" and that it "authorizes the search of vessels or vehicles without cause"); *United States v. Ajlouny*, 629 F.2d

---

[1] Boumelhem argues that border searches that are not authorized by statute are per se unreasonable and thus barred by the Fourth Amendment. Because we find that the search here was authorized by statute, we need not determine whether a border search is unconstitutional when unauthorized by statute. *Compare United States v. Williams*, 617 F.2d 1063, 1074 (5th Cir. 1980) (en banc) (indicating that where the government can point to no statutory or independent executive authority, a court must conclude that a search is unconstitutional), *with United States v. Gonzalez*, 875 F.2d 875, 877 (D.C. Cir. 1989) (suggesting that a search without statutory authorization may not be a constitutional violation). We also need not determine whether evidence obtained in violation of an authorizing statute must be excluded even if there has been no violation of the Fourth Amendment. *See Gonzalez*, 875 F.2d at 877-78, 878 n.1.

830, 836 n.7 (2d Cir. 1980) (citing § 1581 for the proposition that "customs officials have statutory authority to conduct inspections at a point of embarkation of cargo being shipped abroad"); *United States v. Whitmire*, 595 F.2d 1303, 1308 (5th Cir. 1979) (noting that "[r]ead literally, that statute grants extremely broad authority" to Customs officials). Given the statute's broad definition of "vehicle"[2] and the authorization to search "any place" in the United States, we conclude that the statute authorizes the search of a cargo container in a railroad yard, the situation here. Having concluded that the search was authorized by statute, we must next consider whether the search was proper under traditional Fourth Amendment principles.

> 2. The Border Search Exception Applies to Persons and Articles Leaving the Country, and Not Only to Those Entering the Country.

Boumelhem also argues that the Supreme Court decisions that deal with the border search exception to the Fourth Amendment "do not by their own logic apply to exit searches." Boumelhem adds that, although other circuits have concluded that warrantless exit searches are constitutionally permissible, such searches have generally been limited to situations involving the smuggling of currency. Boumelhem weaves these two threads together to argue that the border search exception should not apply to the present situation. Notwithstanding Boumelhem's arguments, the border search exception applies to the search of the outgoing cargo container here.

A search without a warrant is "per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions." *Katz v. United*

---

[2] The statute defines vehicle as "*every description* of carriage or other contrivance used, or capable of being used, as a means of transportation on land, but does not include aircraft." 19 U.S.C. § 1401(b) (emphasis added).

*States*, 389 U.S. 347, 357 (1967); *see also United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996). The border search exception generally provides that routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant. *See Ramsey,* 431 U.S. at 616-619; *Almeida-Sanchez v. United States*, 413 U.S. 266, 272-273(1973); *Carroll v. United States*, 267 U.S. 132, 154, (1925). Such searches may be conducted at an international border checkpoint or its functional equivalent. *See Almeida-Sanchez*, 413 U.S. at 272-73.[3] Further, every circuit that has considered the question has concluded, at least with regard to the circumstances before it, that the border search exception applies to "exit searches" as well as searches of incoming persons and materials. *See, e.g., United States v. Oriakhi*, 57 F.3d 1290, 1296 (4th Cir. 1995) (noting, in following other circuits, that "every other circuit addressing the issue has held that the exception applies regardless of whether the person or items searched are entering or exiting the United States").[4] Moreover, a Supreme Court chambers opinion written by

---

[3] Boumelhem does not challenge the district court's finding that the search of the container took place at the functional equivalent of the border. Nor does Boumelhem argue that the search was a physically intrusive, "non-routine" search, which would require reasonable suspicion. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 540-41, 540 n.3, 541 n.4 (1985); *United States v. Molina-Tarazon*, 279 F.3d 709, 712-13 (9th Cir. 2002) (applying non-routine search analysis to inspection of a vehicle due to the particular intrusiveness of the search).

[4] In addition to the Fourth Circuit, the Second, *United States v. Ajlouny*, 629 F.2d 830, 834 (2d Cir. 1980), the Third, *United States v. Ezeiruaku*, 936 F.2d 136, 143 (3d Cir. 1991) , the Fifth, *United States v. Berisha*, 925 F.2d 791, 795 & n.8 (5th Cir. 1991), the Eighth, *United States v. Udofot*, 711 F.2d 831, 839-40 (8th Cir.), the Ninth, *United States v. Stanley*, 545 F.2d 661, 667 (9th Cir. 1976), and the Eleventh Circuits, *United States v. Hernandez-Salazar*, 813 F.2d 1126, 1138 (11th Cir. 1987), have concluded that the border search exception applies to persons or articles leaving the country, at least with regard to the circumstances before them.

Chief Justice Rehnquist, as well as dicta in a Supreme Court majority opinion, also support the applicability of the border search exception to persons or articles leaving the country. *Julian v. United States*, 463 U.S. 1308 (Rehnquist, Circuit Justice 1983); *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 63 (1974).

Boumelhem notes that many of the cases from other circuits have only dealt with exit searches in the context of currency smuggling, and contends that the special national interest in protecting currency is not implicated by the search here. In support of this argument, Boumelhem cites cases from the Eleventh and Fifth Circuits that have expressly declined to consider the "exit" border exception outside the context of currency smuggling. *See United States v. Berisha*, 925 F.2d 791, 795 n.8 (5th Cir. 1991) ( "We express no opinion, however, on the fourth amendment implications of routine, suspicionless searches for exportation of articles other than monetary instruments."); *United States v. Hernandez-Salazar*, 813 F.2d 1126, 1138 (11th Cir. 1987) ("Although we need not decide here whether the 'border exception' applies equally in all respects to incoming and outgoing searches at the border, we conclude that Congress may . . . authorize . . . warrantless searches of persons and property departing the United States on the basis of reasonable suspicion that a currency reporting violation is occurring."). *But see United States v. Oriakhi*, 57 F.3d 1290, 1297 (4th Cir. 1995) ("[W]e join the several other circuit courts which have held that the *Ramsey* border search exception extends to all routine searches at the nation's borders."); *United States v. Ezeiruaku*, 936 F.2d 136, 143 (3d Cir. 1991) ("[T]he traditional rationale for the border search exception applies as well in the outgoing border search context."); *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir. 1982) ("Since this was a search at a 'border', of a person leaving the country, there is no need for probable cause, warrants or even suspicion").

In *Ramsey*, the Supreme Court detailed the rationale that undergirds the border search exception to the Fourth Amendment, noting that border searches, "pursuant to the power of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616.[5] In extending the

[5]In addition to relying on the sovereign's right to protection of its borders, the Supreme Court noted that the first customs statute, which was enacted by the First Congress, authorized warrantless searches of ships and vessels. *Ramsey*, 431 U.S. at 616-17 (quoting Act of July 31, 1789, c.5, 1 Stat. 29 § 24). The Court found that this authorization, enacted by the legislative body that two months later would propose the Fourth Amendment, demonstrated the reasonableness of such searches, noting that the Fourth Amendment should be construed in light of what was deemed reasonable at the time of the Amendment's enactment. *Id*. at 616-17, 619 n.14.

The use of the "sovereign protection" rationale in connection with exit searches has been criticized by some for failing to acknowledge that the *Ramsey* decision was based, in part, on the historical pedigree of warrantless entry searches. *See, e.g., Oriakhi*, 57 F.3d at 1304 (Phillips, J., concurring) ("Absent any evidence of 18th century precedent for suspicionless warrantless exit searches, it simply is not true, as the majority asserts, that the 'principles articulated in' *Ramsey* justify application of the border search exception to exit searches."(citation omitted)). However, there does seem to be a small body of 18th century precedent for warrantless exit searches.

The Third Congress, on May 22, 1794, passed "An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the Same." Act of May 22, 1794, c.33, 1 Stat. 369. The act prohibited the export of many types of firearms for one year. *Id*. Further, the act provided that it was

the duty of the custom-house officers, and of all persons employed in the collection of the revenue, to attend to the execution of this law, and all forfeitures and penalties incurred under it, shall be sued for, prosecuted, adjudged and distributed in like manner as is provided in the act, entitled "An act to provide more effectually for the collection of the duties imposed by

border search exception to exports, the Fourth Circuit has concluded that the "power of the sovereign to protect itself" also applies in the context of exit searches. *See, e.g., Oriakhi*, 57 F.3d at 1296-97. In addition , other circuits, in keeping with the notion that "[t]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests," *Montoya de Hernandez*, 473 U.S. at 537, have employed a balancing approach when analyzing the application of the border search exception to articles or persons leaving the country, *see e.g., United States v. Stanley*, 545 F.2d 661, 667 (9th Cir. 1976).

We conclude that each of the above rationales supports the application of the *Ramsey* border search exception to the

law on goods, wares and merchandise imported into the United States, and on the tonnage of ships and vessels."

*Id*. § 4. The act to which this section refers, the Act of August 4, 1790, c.35, 1 Stat. 145, replaced the Act of July 31, 1789, the statute which the *Ramsey* court found historically significant. *Id*. § 74. In addition, the Act of August 4, 1790, which was also enacted by the First Congress, contained a warrantless-search provision that was identical to the warrantless-search provision from the Act of July 31, 1789, the provision upon which the *Ramsey* court focused in its historical analysis. *Compare* Act of July 31, 1789, c.5, 1 Stat. 29 § 24, *with* Act of August 4, 1790, c.35, 1 Stat. 145 § 48.

Thus, it seems that the Third Congress thought it reasonable that the prohibition on exports, and presumably the searches necessary thereunder, would be executed in the same manner as the earlier laws regarding imports, which had allowed for warrantless searches. Granted, the historical pedigree of the Act of May 22, 1794, c.33, 1 Stat. 369, cannot rival that of the Act of July 31, 1789, c.5, 1 Stat. 29, which was enacted only two months before the Fourth Amendment was proposed. Nor does the Act of May 22, 1794 clearly provide for warrantless exit searches, as the Act of July 31, 1789 did. Nevertheless, the statute, by linking the execution and prosecution of the prohibition on exports to the enforcement structure created by import laws, does appear to provide some historical support for the acceptance of warrantless exit searches almost contemporaneously with the proposal of the Fourth Amendment.

search of the outgoing cargo container here. While most cases that have dealt with this issue previously have involved the protection of the sovereign's interests in its currency, *e.g. Oriakhi*, 57 F.3d at 1297, the United States's interest in preventing the export of weapons to other countries also implicates the sovereign's interest in protecting itself. *See id.* at 1297 ("From the sovereign's power to protect itself is derived its power to . . . prohibit the export of its currency, national treasures, and other assets. . . . As important [as the sovereign's interest in excluding undesirable outside influences] is the sovereign's interest in regulating foreign commerce."). Further, this interest also weighs heavily when balanced against the individual's Fourth Amendment interest in being free from the search at issue. The government's control and regulation of the export of weapons implicates significant government interests in the realms of national security and relations with other nations. On the other side of the scales, "travellers (or exporters) undoubtedly have a lesser expectation of privacy when they (or their goods) leave the country if for no other reason than the departure from the United States is almost invariably followed by an entry into another country which will likely conduct its own border search." *Oriakhi*, 57 F.3d at 1302 (Phillips, J., concurring) (citation omitted).[6] Thus, the warrantless search of the cargo container was permitted under the *Ramsey* border search exception.

C. The Search Was Not "Tainted" by the Participation or Direction of the FBI.

The search in this case was, moreover, not tainted by the participation or direction of the FBI. Boumelhem contends that the search was unconstitutional because the FBI used

---

[6]The lessened expectation of privacy attendant to the export of materials is aptly demonstrated here, as Fouad testified that he and his brother, Boumelhem, have, in recent years, annually shipped a container of car parts to Lebanon, and that every year the government of Lebanon has searched the container.

Customs as a means of circumventing the warrant requirement that would apply if the FBI were acting on its own and therefore lacked the statutory authority that Customs has to conduct warrantless border searches.[7]

The contention lacks merit because, while Customs was acting in conjunction with the FBI, the record demonstrates that Customs was pursuing its own law enforcement objectives. In doing so, Customs was acting as a separate law enforcement agency subject to the Fourth Amendment restrictions that apply to Custom's authorized jurisdiction, which jurisdiction was implicated when the container arrived at the railroad yard for shipment to another country. In addition, it would serve no underlying interest of the Fourth Amendment to permit one arm of the government to search for no reason, while forbidding another arm of the government from searching under suspicious circumstances. As the Supreme Court has explained in similar circumstances:

Respondents, however, contend in the alternative that because the Customs officers were accompanied by a Louisiana State Policeman, and were following an informant's tip that . . . they may not rely on the statute authorizing boarding for inspection of the vessel's documentation. This line of reasoning was rejected in a similar situation in *Scott v. United States*, 436 U.S. 128, 135-139 (1978), and we again reject it. Acceptance of respondent's argument would lead to the incongruous result criticized by Judge Campbell in his opinion in *United States v. Arra*, 630 F.2d 836, 846 (CA 1 1980): "We would see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers."

---

[7]This argument assumes that statutory authority is required for an agency to comply with the Fourth Amendment. We need not decide this but again make the assumption for purposes of argument. *See supra* note 1.

*United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3 (1983). A contrary view, moreover, would ignore the reasonable law enforcement practice that has arisen to address situations in which criminal enterprises span the jurisdictions of numerous law enforcement agencies. In short, Customs may properly exercise its statutory authority at the behest of the FBI.

In arguing that the search was unconstitutional due to the FBI's circumvention of the warrant requirement, Boumelhem relies upon a Ninth Circuit case that, assuming it was correctly decided,[8] clearly is distinguishable. In *United States v. Soto-Soto*, 598 F.2d 545 (9th Cir. 1979), an FBI agent, acting alone, stopped and searched a truck that was entering the United States from Mexico. *Id*. at 546. The Ninth Circuit concluded that the FBI agent did not have reasonable suspicion to stop the vehicle, and that the stop, therefore, violated the Fourth Amendment. *Id*. at 547. In rejecting the Government's assertion that the search was justified by the border exception, the court noted that the FBI agent, unlike Customs agents or border patrol agents, was not authorized by Congress to conduct border searches. *Id*. at 548-50. The court also noted that the FBI agent was not cooperating with Customs officials. *Id*. at 550. The court concluded that the search was, therefore, not an authorized border search under 19 U.S.C. § 482. *Soto-Soto*, 598 F.2d at 550; *see also United States v. Fogelman*, 586 F.2d 337, 344 (5th Cir. 1978)(suggesting, in dictum, that the *Fogelman* court might have found a violation of the Fourth Amendment had "pretext or bad faith on the part[] of local officers in having the

---

[8] The Ninth Circuit in *United States v. Harrington* arguably limited the rationale of *Soto-Soto*. *United States v. Harrington*, 681 F.2d 612, 615 (9th Cir. 1982) ("[A] Court should not automatically suppress evidence seized by an officer who for some technical reason should not have conducted the search. There must be an exceptional reason, typically the protection of a constitutional right, to invoke the exclusionary rule." (citations omitted)).

Customs agents participate as a 'portable search warrant'" been demonstrated).

Unlike in *Soto-Soto*, here the district court concluded that the FBI had been cooperating with Customs as a part of a joint task force. The record also reflects that Customs agents initially caused the container to be taken to a Customs facility and that a number of Customs agents, approximately twenty, participated in the search. Customs agents were the ones who discovered every piece of evidence, and the evidence was logged by Customs agents. Thus, the record amply supports the district court's determination that Customs actively cooperated in the search. In addition, Customs had its own interest in the suspected export of weapons as a possible violation of laws that it is charged with enforcing, and was acting in good faith in pursuing this interest. *See generally* The Arms Export Control Act, 22 U.S.C. § 2751-§ 2799aa.[9]

Boumelhem also relies by analogy on cases in which Fourth Amendment protections have been held to apply to searches conducted by private individuals who were directed by law enforcement agencies. Boumelhem correctly notes that when a private individual, who is not subject to the restrictions imposed by the Fourth Amendment, acts at the direction of law enforcement agents, the "private" search must comport with the Fourth Amendment. *See, e.g., United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985). In such an instance, the private individual acts like an agent of the law enforcement agency, and is, therefore, subjected to the same restrictions as the law enforcement agency. *See Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971) ("The question presented here is whether the conduct of the police officers at the Coolidge house was such as to make [the private

---

[9] Customs enforces a number of laws for other arms of the Executive Branch, including laws that deal with the "[i]mportations and exportations of arms, ammunition, . . . and other munitions of war [that] are . . . administered by the . . . Department of State," 19 C.F.R. § 161.2, such as the Arms Export Control Act, *see* 22 C.F.R. § 127.4.

individual's] actions their actions for purposes of the Fourth and Fourteenth Amendments. . . ."). These cases are entirely inapposite. The Fourth Amendment does not apply at all to individuals, and permitting the government to circumvent the limits of the Fourth Amendment by directing individuals to conduct searches that the government cannot, would totally undermine the purposes of the Fourth Amendment. In contrast, permitting one government agency to search, where an individual has every reason to expect that another agency may search the same place, has little if any adverse effect on the policies underlying the Fourth Amendment.

The cooperation between the FBI and Customs in this case did not render the warrantless search of the cargo container unconstitutional.

II. *Boumelhem Was a "Felon" as Required Under 18 U.S.C. § 922(g).*

A. Standard of Review

Next, Boumelhem asserts that the district court erroneously concluded that he was a "felon," for the purposes of 18 U.S.C. § 922(g), resulting in his wrongful conviction on six of the seven crimes with which he was charged. This is a legal question involving the interpretation of California statutes, and, as such we review the question *de novo*. *United States v. Morgan*, 216 F.3d 557, 561-62 (6th Cir. 2000).

B. Boumelhem Had Been Convicted of "A Crime Punishable by Imprisonment for a Term Exceeding One Year" at the Time of the Conduct at Issue.

Here, six of the seven counts upon which Boumelhem was convicted required the Government to demonstrate that Boumelhem had been convicted of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). Section 921(20)(B) further qualifies this term:

The term "a crime punishable by imprisonment for a term exceeding one year" does not include

. . .

(B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less. What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held.

18 U.S.C. § 921(20).

Here, Boumelhem pleaded nolo contendere to grand theft of personal property exceeding $400, a violation of California Penal Statute § 487. This form of grand theft is punishable either by imprisonment in a county jail not exceeding one year or by imprisonment in the state prison for a term of up to three years. Cal. Penal Code § 489; *id*. §18; *see California v. Powell*, 166 Cal. App. 3d Supp. 12, 16 (1985). Offenses of this type are referred to as "wobbler" offenses in the California courts, meaning that the sentence imposed determines the classification under state law as either a misdemeanor or felony. *See* Cal. Penal Code § 17; *Powell*, 166 Cal. App. 3d Supp. at 16. This distinction is relevant here because, if Boumelhem's conviction were classified as a misdemeanor under California law, it would be punishable only by imprisonment not exceeding one year. *See* Cal. Penal Code § 17; *id*. § 489. The offense would, therefore, satisfy both elements of the § 921(20)(B) exception.

California Penal Code § 17(b) treats the classification of "wobbler" offenses, and provides, in pertinent part:

(b) When a crime is punishable, in the discretion of the court, by imprisonment in the state prison or by fine or imprisonment in the county jail, it is a misdemeanor for all purposes under the following circumstances:

(1) After a judgment imposing a punishment other than imprisonment in the state prison.

. . .

(3) When the court grants probation to a defendant without imposition of sentence and at the time of granting probation, or on application of the defendant or probation officer thereafter, the court declares the offense to be a misdemeanor.

Cal. Penal Code § 17. Thus, under § 17(b), the offense is regarded as a felony until a judgment is entered, except where the court declares otherwise. *People v. Soto*, 166 Cal. App. 3d 770, 774-75 (1985).

After Boumelhem pleaded nolo contendere, proceedings were suspended and Boumelhem received felony probation, with the condition that he spend six days in the county jail. Under California law, where the sentencing court grants probation and proceedings are suspended, no judgment is rendered. *United States v. Robinson*, 967 F.2d 287, 293 (9th Cir. 1992) (citing *People v. Arguello*, 59 Cal.2d 475, 476 (1963)).[10] Further, at the time Boumelhem took the actions

---

[10]Boumelhem states that a judgment is not necessarily required, relying upon *Patrick v. Glee*, 82 Cal. App. 4th 99 (2000), in which a California appellate court, for the purposes of the California Three Strikes law, concluded that when the sentencing court "ordered appellant to serve one year in the county jail and directed that probation be terminated upon completion of the jail term, it automatically rendered the crime a misdemeanor pursuant to [§ 17(b)(1)]." *Id.* at 105-06. The *Glee* court reached this conclusion by distinguishing cases in which imposition of judgment had been suspended, the defendant was ordered to serve jail time as a condition of probation, and some portion of the probationary period remained after the defendant's release from the county jail. *Id.* at 103-05. In so distinguishing these cases, many of which were cited by the Government in the present case, the *Glee* court noted because the defendant's probation and the jail sentence had ended at the same time, "the record supports the inference that the sentencing court did not intend to retain jurisdiction over appellant with the possibility of later imposing

---

that would form the basis of his federal conviction, the sentencing court had not declared Boumelhem's earlier state conviction to be a misdemeanor. Thus, neither § 17(b)(1), which requires a judgment, nor § 17(b)(3), which requires a classification by the court, applied to Boumelhem at the time he took the actions that would lead to his federal convictions. *See United States v. Morgan*, 216 F.3d 557, 565-66 (6th Cir. 2000) ("It is the status of the defendant on the date he possessed the firearm as alleged in the indictment that controls whether or not he has violated the statute, not his later status after his civil rights have been restored.").[11] We therefore conclude that the district court properly found that Boumelhem had been convicted for a crime punishable by imprisonment for a term exceeding one year.

III. *The District Court Erred by Enhancing Boumelhem's Sentence Under USSG § 2K2.1(b)(5).*

The district court assessed a four-point enhancement against Boumelhem under USSG § 2K2.1(b)(5) based on his possession of a firearm in connection with another felony

---

a prison sentence." *Id.* at 103, 105. Thus, in essence, the *Glee* court concluded that because the sentencing court did not intend to retain jurisdiction over the defendant, and sentenced the defendant to a county jail sentence, the court's sentence was the equivalent of entering a judgment for a one-year county jail term, which would be a misdemeanor under § 17(b)(1). *See id.* at 105-06. In the present case, however, the judgment was suspended and the probationary period extended beyond the conditional county-jail sentence, demonstrating the that court did intend to retain jurisdiction over Boumelhem. Thus, this instance appears to fall within the class of cases that *Glee* distinguishes and outside the scope of *Glee* itself.

[11]Below, Boumelhem argued that the California sentencing court, by declaring Boumelhem's offense a misdemeanor *after* Boumelhem had been charged, retroactively deemed Boumelhem's offense a misdemeanor "for all purposes," thus precluding the use of the charge as a predicate felony conviction. He has not made this argument on appeal and we therefore decline to treat the issue.

offense—the conspiracy to deliver to any common carrier for shipment a firearm or ammunition without written notice to the carrier that such firearm or ammunition is being shipped, a violation of 18 U.S.C. § 922(e).[12] The relevant Sentencing Guideline, in pertinent part, reads "If the defendant used or possessed any firearm or ammunition in connection *with another felony offense*; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels." USSG § 2K2.1(b)(5) (2001) (emphasis added). Application note 18 to § 2K2.1(b)(5), in part, states:

> As used in subsection[] (b)(5) . . . "another felony offense" . . . refer[s] to offenses other than explosives or *firearms possession or trafficking offenses*. However, where the defendant used or possessed a firearm or explosive to facilitate another firearms or explosives offense (e.g., the defendant used or possessed a firearm to protect the delivery of an unlawful shipment of explosives), an upward departure under §5K2.6 (Weapons and Dangerous Instrumentalities) may be warranted.

*Id*. cmt. n. 18 (emphasis added).[13] Boumelhem objects to the enhancement of his sentence, arguing that the conspiracy to ship or transport firearms and ammunition in foreign

---

[12] On appeal, Boumelhem interprets the district court to have relied upon the conspiracy to violate 922(g), but a careful reading of the sentencing hearing transcript leads us to conclude that the district court relied, at least primarily, upon the conspiracy to violate 922(e) as the other felony offense.

[13] Guideline commentary is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline. *Stinson v. United States*, 508 U.S. 36, 38 (1993).

commerce is a "firearms trafficking offense" as that phase is used in the application note. We agree.

As used in the application note, "firearms" is a noun used as an adjective to modify "trafficking offenses." *See United States v. English*, 329 F.3d 615, 617 (8th Cir. 2003). "Traffic," as the root of "trafficking," has been defined in *Webster's Third International Dictionary* as "to engage in commercial activity" or "to engage in illegal or disreputable business or activity." *Webster's Third International Dictionary* 2423 (2002); *see also Webster's II New College Dictionary* 1168 (2001) ("Illegal or improper commercial activity"). Conspiring to deliver firearms or ammunition for shipment to a common carrier in a manner that would violate 18 U.S.C. § 922(e) would clearly implicate an offense for firearms-related "commercial activity." There is no indication in the record that this is a situation, like that suggested in the application note, where firearms were possessed to facilitate the transport of other firearms, and even in that situation, the guidelines do not provide for enhancement under § 2K2.1(b)(5).[14] The district court therefore erred in enhancing Boumelhem's sentence under USSG § 2K2.1(b)(5) based upon Boumelhem's conviction for conspiring to violate 18 U.S.C. § 922(e).

Rather than responding to Boumelhem's argument, the Government argues that the district court could have concluded that Boumelhem possessed firearms in connection with violations under the Arms Export Control Act. First, we question whether a violation of the Arms Export Act would not also constitute a "firearms trafficking offense" as contemplated by the application note. Regardless, we need not address the issue. While we may affirm a district court's

---

[14] In such a situation the application note counsels that an upward departure from the sentence for the trafficking offense, not the possession offense, may be appropriate under USSG § 5K2.6. *See* USSG § 2K2.1(b)(5) cmt. n. 18.

judgment for reasons other than those stated by the lower court, *Apple v. Glen*, 183 F.3d 477, 479-80 (6th Cir. 1999), we may also choose to disregard an appellee's alternative argument in support of a lower court's decision. *Hunter v. United States*, 160 F.3d 1109, 1114 (6th Cir. 1998) (declining to address an appellee's argument that had not been presented below because the argument was fact-intensive and the record was undeveloped). Below, the Government did not claim that Boumelhem violated the Arms Export Control Act and consequently the record is not developed with regard to a possible Arms Export Control Act violation. Accordingly, "we conclude that the government forfeited its right to rely on [a violation of the Arms Export Control Act] by failing to raise the issue in the district court." *Id*.

### CONCLUSION

For the foregoing reasons, we affirm Boumelhem's convictions, but vacate his sentence and remand to the district court for resentencing consistent with this opinion.