DAMON J. KEITH, Circuit Judge,
concurring in the judgment.
I cannot join the majority’s interpretation of the Fourth Amendment. In holding that Customs and Border Protection (“CBP”) officers may, without reasonable suspicion, search individuals who are not in the process of crossing an international border, the majority stretches the “border search” exception to its breaking point.
A. Application of the Border Search Exception Must be Tethered to the Primary Purpose of the Exception
“A search without a warrant is ‘per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions.’ ” United States v. Boumelhem, 339 F.3d 414, 420 (6th Cir. 2003) (quoting Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). “The border search exception generally provides that routine searches of the persons and effects of [those who enter the country from another country] are not subject to any requirement of reasonable suspicion, probable cause, or warrant.” Id.
The primary purpose for this exception is to allow the government to invoke its “longstanding right ... to protect itself by stopping and examining persons and property crossing into this country.” See United States v. Flores-Montano, 541 U.S. 149, 152, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004). In Boumelhem, we recognized that this exception applies equally to those who are exiting the country. Boumelhem, 339 F.3d at 422 (concluding that “the United States’s interest in preventing the export of weapons to other countries also implicates the sovereign’s interest in protecting itself’). The application of the border search exception “must remain tethered to its primary purpose.” United States v. Humphries, 308 Fed.Appx. 892, 896, n.1 (6th Cir. 2009).
As the Supreme Court has recognized, “[bjorder searches ... have been considered to be ‘reasonable’ by the single fact that the person or item in question had entered into our country from the outside.” United States v. Ramsey, 431 U.S. 606, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977) (emphasis added). At least eight other circuits have also recognized this fact. United States v. Irving, 452 F.3d 110, 123 (2d Cir. 2006) (“[R]outine border searches of a person’s belongings are made reasonable by that person’s decision to enter this country.”); United States v. Cortez-Rocha, 394 F.3d 1115, 1118-119 (9th Cir. 2004) (“Border searches ... have been considered to be reasonable by the single fact that the person or item in question had entered into our country from outside.”); United States v. Oriakhi, 57 F.3d 1290, 1295 (4th Cir. 1995) (same); United States v. Victoria-Peguero, 920 F.2d 77, 79 (1st Cir. 1990) (same); United States v. Jackson, 825 F.2d 853, 858 (5th Cir. 1987) (same); United States v. Mayer, 818 F.2d 725, 727 (10th Cir. 1987) (same); United States v. Glasser, 750 F.2d 1197, 1201 (3d Cir. 1984) (same); United States v. Garcia, 672 F.2d 1349, 1354 (11th Cir. 1982) (same).
B. Person or Item to be Searched Must Have Crossed, or be in the Process of Crossing, an International Border
In order for a warrantless, suspicionless search at the border to be deemed “rea *730 sonable,” the item or person to be searched must actually cross the border or be in the process of doing so. See, e.g., Ramsey, 431 U.S. at 620, 97 S.Ct. 1972 (noting that “[t]he critical fact is that [the items to be searched] cross the border and enter this country.... It is their entry into this country from without it that makes a resulting search ‘reasonable’ ”} (emphasis added); Boumelhem, 339 F.3d at 423 (noting that border searches on exiting vehicles are reasonable by virtue of the fact that persons exiting the country “undoubtedly have a lesser expectation of privacy when they (or their goods) leave the country if for no other reason than the departure from the United States is almost invariably followed by entry into another country”) (emphasis added); see also United States v. Delgado, 810 F.2d 480, 483 (5th Cir. 1987) (“Regardless of the type of [border] search involved, the fact that a border crossing occurred must be demonstrated.”); United States v. Garcia, 672 F.2d 1349, 1357 (11th Cir. 1982) (concluding that the “point of origin has no bearing on the reasonableness of a [border] search so long as a border crossing has been established”). Here, the Government does not dispute that D.E. did not cross the border and was not in the process of crossing the border when his vehicle was searched.
C. Reasonable Suspicion Was Required for the Search of D.E.’s vehicle
When CBP officials seek to search an item or person on the basis of general “contact with the border area,” without evidence that the item or person has crossed the border or is in the process of crossing, reasonable suspicion is required. United States v. Glaziou, 402 F.2d 8, 13-14 (2d Cir. 1968), cert denied, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969) (holding that persons who have “direct contact with a border area” or whose movements are “reasonably related to the border area” are not subject to search absent suspicion); United States v. McGlone, 394 F.2d 75, 78 (4th Cir. 1968) (noting that when a crossing does not occur, “[t]he validity of the search usually depends upon whether all the facts establish reasonable cause to suspect that merchandise presently is being illegally introduced into the United States by the person the officer proposes to search”).
Here, D.E. was given a card — while he was in a border area — that said he was “being allowed to turn around without traveling to Canada.” The government acknowledges that he did in fact turn around without traveling to Canada. Yet, the government does not assert any factors supporting reasonable suspicion to search D.E.’s vehicle; indeed, it argues that reasonable suspicion was not required. But because D.E. did not cross the border and was not in the process of crossing the border, reasonable suspicion was required for the search of D.E.’s vehicle.[1]
D. Difficulty in Complying with the Dictates of the Constitution is Not a Free Pass to Not Comply
The majority asserts that it is difficult for CBP officers to tell the difference between the motorist who has actually crossed the border and the motorist who was allowed to turn around because both such motorists are funneled into the same line. The majority also states that the lami *731 nated card from the CBP officers given to D.E., stating that he was being allowed to turn around without crossing the border, is not reliable because the card can be fabricated. The majority loses the forest for the trees.
For starters, difficulty in complying with the dictates of the United States Constitution is not a free pass to not comply. While we ascertain the “reasonableness” of Fourth Amendment intrusions, that “reasonableness” does not turn on convenience' or ease. Cf. United States v. Ogbuh, 982 F.2d 1000, 1004 (6th Cir. 1993) (“Delay due to any difficulty in locating an Assistant U.S. Attorney to approve the warrant request does not excuse abrogation of the requirements of the Fourth Amendment.”).
Second, the so-called difficulties in distinguishing between turnaround motorists and motorists who are actually crossing the border are created by the CBP. The CBP chooses to comingle non-crossing motorists with crossing motorists, such that it is difficult to discern the difference between the two. The CBP chooses to use a laminated card that can be easily fabricated.[2] The CBP cannot erect a procedurally flawed system, and then use it as an excuse for not complying with the Fourth Amendment. See id. (“[T]he government may not erect a system of procedural delay and then use it as an excuse for not obtaining a warrant.”).
Further, the majority’s assertion that CBP officials are not lie detectors and therefore cannot discern which motorists crossed the border is unavailing. To begin, it is not for this court to fashion a way for the CBP officials to comply with the Fourth Amendment. Nevertheless, a plausible alternative proves fatal to the majority’s “lie detector” justification. For example, it is possible for the CBP officials to communicate with one another regarding motorists who were permitted to turn around. Indeed, aside from the “easily fabricated” laminated card, these motorists have other readily identifiable features: the make and model of their vehicle, their unique license plate number, and/or their driver identification information.[3] Such officials generally have no difficulty in using various modes of communication when they are alerting each other that someone or something should be seized or searched. Nevertheless, it is not our place to tell the CBP officials what practice to adopt, but it is our place — and indeed our duty — to safeguard the constitutional rights of citizens when that practice falls short of the dictates of the Fourth Amendment.
E. Reliance on Humphries Misplaced
The majority’s reliance upon our nonbinding, unpublished decision in United States v. Humphries, 308 Fed.Appx. 892, 896 (6th Cir. 2009) is unavailing for a number of reasons. First, the motorist in Humphries was, from all objective appearances, on his way out of the country at the time of the search. See id. at 893 (noting that Humphries was in the direction of outgoing traffic and was “right next to the station where cars are inspected before entering the tunnel” to go to Canada). An officer testified that cars arriving “in that position” have “made somewhat of a commitment to go to Canada.” Id.
*732 The Humphries court appreciated that, regardless of Humphries’ statements about his intent, he was in-a position to exit the country. Id. at 896 n.l (explaining that the court was dealing with a “possible exit from the country”). Accordingly, Hum-phries’ situation was covered by our rationale in Boumelhem because, from all objective appearances, Humphries was in the process of crossing the border. See id. at 896.
In contrast, when D.E. was searched, he was not in a position to cross the border. D.E. was in the line of cars heading into the United States, positioned away from Canada, and it is undisputed that he had not crossed into Canada, and was not in the process of crossing into Canada. At that point, it is of no moment whether or not he had initially intended to cross the border — the reality is that he did not and could not from such a position. Unlike in Humphries, here we are not dealing with a “possible exit from the country.” Unlike in Humphries, cars in the position of D.E.’s vehicle have not “made somewhat of a commitment to go to Canada.” Indeed, cars in his position have made somewhat of a commitment not to go to Canada. Therefore, I believe Humphries is too factually inapposite to provide much persuasive guidance in this case.
Indeed, other than its misplaced reliance on Humphries, the majority does not cite any case in this country, binding or otherwise, holding that a turnaround motorist who is not in the process of crossing the border is subject to search at the border absent reasonable suspicion. Nor. am I aware of such a case.
The border search exception “is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country.” Ramsey, 431 U.S. at 620, 97 S.Ct. 1972 (emphasis added). By extending this exception to the situation presented here, the majority uproots this exception from its well-grounded foundation. “If police have little incentive to [comply with the Fourth Amendment,] they will not do so. The law must provide that incentive; otherwise, the warrant requirement of the Fourth Amendment will become a dead letter.” Ogbuh, 982 F.2d at 1004. Today, yielding to the government’s complaints that compliance is too difficult, the majority assists the CBP in burying the Fourth Amendment. I cannot concur in that position.
F. Constitutional Right Not Clearly Established
Nevertheless, because the matter before us is a civil suit alleging violations of D.E.’s civil rights under § 1983, the officials are entitled to qualified immunity unless D.E. can establish (1) that his constitutional rights were violated, and (2) that the right was clearly established at the time of the violation. Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006). For the reasons above, I would hold that D.E.’s constitutional rights were violated. I turn, then, to examining whether that right was clearly established at the time of the violation.
To be clearly established, “the contours of the right must be sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right.” Coley v. Lucas County, Ohio, 799 F.3d 530, 539-40 (6th Cir. 2015). “Rights are not clearly established unless either a precedent squarely governs the outcome of the case or the case is [entirely] obvious.” Libretti v. Woodson, 600 Fed.Appx. 367, 370-71 (6th Cir. 2015) (internal quotation marks omitted). “The inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.” Coley, 799 F.3d at 540 (internal quotation marks and citation omitted). *733 However, “officials can still be on notice that their conduct violates established law even in novel factual circumstances.” Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). “To resolve this question, this Court ‘must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.’” Campbell v. City of Springboro, Ohio, 700 F.3d 779, 788 (6th Cir. 2012) (citation omitted).
While I am inclined to conclude that the right was clearly established, three other judges (the two on this panel, and the district court judge) have concluded — for whatever reason — that our unpublished decision in Humphries can be read as sanctioning the conduct in this case. While I disagree for the reasons explained above, Humphries’ supposed muddling of the waters in this area compels me to conclude that it less likely that a reasonable official would have known that his conduct violated a clearly established right. See Sheets v. Moore, 97 F.3d 164, 168 (6th Cir. 1996) (“If federal district judges could reasonably disagree over the constitutionality of the regulation, then it can fairly be said that a reasonable official would npt have known that his conduct violated a clearly established right.”). Therefore, I concur in the judgment of the majority to dismiss D.E.’s civil rights complaint.
I am deeply troubled that the CBP has established a pattern and practice of violating the Fourth Amendment. Direct evidence of this practice is the laminated card. The laminated card provided by the CBP states that the person receiving the laminated card is being allowed to turn around without crossing the border. The same card also states that the person (and his or her belongings) are still subject to search by a customs official. This card is written evidence that the CBP has a practice of searching persons and items that have not and will not cross an international border without probable cause and without reasdnable suspicion. Because the “single fact” that makes border searches reasonable — i.e. a border crossing — is completely absent under those circumstances, the CBP’s practice cannot pass constitutional muster. Ramsey, 431 U.S. at 619, 97 S.Ct. 1972 (“[bjorder searches ... have been considered to be ‘reasonable’ by the single fact that the person or item in question had entered into our country from-the outside”) (emphasis added); Id. (noting that the government’s power to exclude contraband “can be effectuated by routine inspections and searches of individuals or conveyances seeking to cross our borders”) (emphasis added). I am even more troubled by the majority’s choice to rubberstamp this conduct. I am concerned that if government officials can escape the bounds of the U.S. Constitution by simply forming their lips to say compliance is too difficult, eventually there will be little left of a Constitution to protect, much less a society unburdened by unreasonable intrusions.

. Even assessing the totality of the circumstances for reasonable suspicion, no such suspicion existed here. Making a U-turn in order to avoid a border checkpoint is not by itself enough to establish reasonable suspicion for a border search. See United States v. Montero-Camargo, 208 F.3d 1122, 1137 (9th Cir. 2000) (noting that "a turnaround alone is not enough in and of itself to create reasonable suspicion”).

. And notably these days, there are few things, including passports and identification cards, that cannot be fabricated. It would be a slippery slope if courts started to deem unreasonable intrusions to be "reasonable” because of the possibility of document fabrication.

. The government did not assert any difficulties in monitoring these turnaround vehicles to make sure they actually turned around.