RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0171P (6th Cir.)
File Name: 04a0171p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOHN DOE, Individually;
MARY ROE, Individually and
as Natural Mother of A. ROE,
B. ROE, and C. ROE, her
minor daughters; and
FREEDOM FROM RELIGION
FOUNDATION, INC.,
          *Plaintiffs-Appellees,*

v.

SUE PORTER, Individually and
as Superintendent of the Rhea
County School System; RHEA
COUNTY BOARD OF
EDUCATION; JIMMY WILKEY,
Individually and as County
Executive for Rhea County,
Tennessee; and RHEA
COUNTY, TENNESSEE,
          *Defendants-Appellants.*

Nos. 02-5316/5823

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 01-00115—R. Allan Edgar, Chief District Judge.

Argued: December 11, 2003

Decided and Filed: June 7, 2004

Before: COLE and CLAY, Circuit Judges; QUIST, District
Judge.[*]

---

**COUNSEL**

**ARGUED:** Michael E. Evans, DAVIES, HUMPHREYS &
EVANS, Nashville, Tennessee, for Appellants.  Alvin L.
Harris, WEED, HUBBARD, BERRY & DOUGHTY,
Nashville, Tennessee, for Appellees. **ON BRIEF:** Michael
E. Evans, DAVIES, HUMPHREYS & EVANS, Nashville,
Tennessee, Charles W. Cagle, LEWIS, KING, KRIEG,
WALDROP & CATRON, Nashville, Tennessee, for
Appellants.  Alvin L. Harris, R. Stephen Doughty, WEED,
HUBBARD, BERRY & DOUGHTY, Nashville, Tennessee,
Joseph Howell Johnston, Nashville, Tennessee, for Appellees.

---

**OPINION**

---

R. GUY COLE, JR., Circuit Judge. Defendants-Appellants
Superintendent Sue Porter ("Superintendent") and the Rhea
County Board of Education ("Board of Education" or
"Board") appeal the district court's grant of summary
judgment for Plaintiffs-Appellees John Doe, Mary Roe, and
the Freedom from Religion Foundation, Inc. ("FFRF"). The
district court:  (1) granted the Plaintiffs' motion to proceed
pseudonymously; (2) held that Plaintiffs had standing to bring
suit against the Board; (3) enjoined, as a violation of the First

---

[*] The Honorable Gordon J. Quist, United States District Judge for the
Western District of Michigan, sitting by designation.

Amendment's Establishment Clause, the Board's allowing religious instruction in the Rhea County public schools; and (4) awarded attorneys' fees. For the reasons below, we **AFFIRM**.

## I. BACKGROUND

For several years the Board of Education has allowed staff and students from Bryan College in Dayton, Tennessee to conduct a program known as the Bible Education Ministry ("BEM") in the county's public elementary schools. Bryan College refers to itself as a Christian school, whose motto is "Christ Above All." The College's mission statement reads, "Educating students to become servants of Christ to make a difference in today's world." Bryan College students and faculty are required to subscribe to a "Statement of Belief," which reads:

> We believe: that the holy Bible, composed of the Old and New Testaments, is of final and supreme authority in faith and life, and, being inspired by God, is inerrant in the original writings; in God the Father, God the Son, and God the Holy Ghost, this Trinity being one God, eternally existing in three persons; in the virgin birth of Jesus Christ; that he was born of the virgin Mary and begotten of the Holy Spirit; . . . that the Lord Jesus Christ is the only Savior, that He was crucified for our sins, according to the Scriptures, as a voluntary representative and substitutionary sacrifice, and all who believe in Him and confess Him before men are justified on the grounds of His shed blood; in the resurrection of the crucified body of Jesus, in His ascension into Heaven, and in "that blessed hope," the personal return to this earth of Jesus Christ, and He shall reign forever; in the bodily resurrection of all persons, judgment to come, the everlasting blessedness of the saved, and the everlasting punishment of the lost.

BEM's volunteer instructors were never employed by the Board. The BEM classes took place for thirty minutes, once a week, during the school day, in three county schools.

Plaintiffs brought this action, pursuant to 42 U.S.C. § 1983, seeking to enjoin the Board's practice of permitting the teaching of the Christian Bible as religious truth as a violation of the First Amendment's Establishment Clause. Following summary judgment in Plaintiffs' favor, Defendants appealed.

## II. ANALYSIS

### A. The District Court's Protective Order

The Board asserts that the district court erred by granting Plaintiffs' motion for a protective order allowing them to proceed pseudonymously. As a general matter, a complaint must state the names of all parties. FED. R. CIV. P. 10(a). However, we may excuse plaintiffs from identifying themselves in certain circumstances. Several considerations determine whether a plaintiff's privacy interests substantially outweigh the presumption of open judicial proceedings. They include: (1) whether the plaintiffs seeking anonymity are suing to challenge governmental activity; (2) whether prosecution of the suit will compel the plaintiffs to disclose information "of the utmost intimacy"; (3) whether the litigation compels plaintiffs to disclose an intention to violate the law, thereby risking criminal prosecution; and (4) whether the plaintiffs are children. *Doe v. Stegall*, 653 F.2d 180, 185-86 (5th Cir. 1981). We review the district court's decision to grant a protective order for an abuse of discretion. *Samad v. Jenkins*, 845 F.2d 660, 663 (6th Cir. 1988).

This suit – challenging a government activity – forces Plaintiffs to reveal their beliefs about a particularly sensitive topic that could subject them to considerable harassment. "[R]eligion is perhaps the quintessentially private matter. Although they do not confess either illegal acts or purposes, the [plaintiffs] have, by filing suit, made revelations about

their personal beliefs and practices that are shown to have invited an opprobrium analogous to the infamy associated with criminal behavior." *Stegall*, 653 F.2d at 186. For instance, in a letter to the editor of a local paper, one Nancy Rogers wrote:

> [Y]ou are [] cowards because you won't give us your name. You know the people in Rhea County would come up to your face and tell you what we think of you. I would love to come face to face with you because yes I would tell you what I thought of you and I would let my sons tell you too. You have hurt my sons and I will not let no one [sic] hurt one of my children. We might not know you but someone higher does [,] and yes you will answer to him.

Indeed, in an article about the lawsuit, the principal of Rhea County High School stated that if he had known the person challenging the BEM, he "would have tried to alert him . . . I'd have said: 'Look do you want to cause your family trouble? This is a rural, conservative place, and very emotional about religion. Attack religion and crusades begin. But you need to follow your own conscience.'"

Further, this case is brought on behalf of very young children, to whom we grant a heightened protection. *Stegall*, 653 F.2d at 186. ("The gravity of the danger posed by the threats of retaliation against the [plaintiffs] for filing this lawsuit must also be assessed in light of the special vulnerability of these child-plaintiffs.").[1]

---

[1] The litigation in this case took place in Rhea County—the site of a mythic *Scopes* trial in the early twentieth century. Bryan College is named after one of the principal lawyers in the case—Williams Jennings Bryan. *See* EDWARD J. LARSON, SUMMER FOR THE GODS: THE SCOPES TRIAL AND AMERICA'S CONTINUING DEBATE OVER SCIENCE AND RELIGION (1997).

The Board also asserts that the district court's protective order hindered its ability to make full discovery, contending that the protective order allowed counsel to know only Plaintiffs' names, residency status, taxpayer information, and school enrollment status. This characterization of the district court's order is incorrect. Although the district court's protective order limited the scope of discovery as to other persons beyond Defendants' counsel of record, it placed no limitation on defense counsel's scope of discovery.

Assuming, for the sake of argument, that the Board's characterization of the trial court's protective order is accurate, it is unclear how this would have hindered its preparation for trial. The only issue for which facts about Plaintiffs would have been crucial is the Board's challenge to Plaintiffs' standing to bring this action. Even under their narrow characterization of the trial court's order, Defendants would have been able to obtain all the information necessary to address the standing inquiry at trial: Plaintiffs' names, residency status, taxpayer information and school enrollment status. Accordingly, the district court did not abuse its discretion by allowing Plaintiffs to litigate pseudonymously.

## B. Standing

The Board challenges the standing of John Doe, Mary Roe and FFRF. We review *de novo* the district court's conclusions of law with regard to standing. *Brandywine, Inc. v. City of Richmond,* 359 F.3d 830, 834 (6th Cir. 2004). To establish standing under Article III of the Constitution, plaintiffs must demonstrate: (1) an injury in fact; (2) a causal connection between the injury and the challenged conduct; and (3) the injury's redressability by a favorable judicial decision. *See id.* at 834-35.

In sworn affidavits, submitted under seal, Doe and Roe assert that they are the parents of three children, two of whom are students at the Rhea County Elementary School. Their eldest daughter – identified as A. Roe – is in fifth grade, and

their second daughter – B. Roe – is in first grade. Each parent testified that students from Bryan College regularly teach BEM classes in their daughters' respective classrooms. In other words, Plaintiffs' minor children have suffered a cognizable injury by being placed in the BEM classes; this injury is derived directly from the BEM classes; and the injury would be redressed by a decision in their favor.

As for FFRF: it may have associational standing to assert the rights of one or more of its members, even if it suffers no direct injury, if it can answer in the affirmative the three questions articulated in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977): (1) whether a member has standing to sue in her own right; (2) whether the interests that it seeks to protect are germane to its purpose; and (3) whether the claim asserted or the relief requested requires the participation of individual members in the lawsuit.

First, John Doe and Mary Roe have standing to bring this action in their individual capacities, and are members of the FFRF. Second, one of FFRF's central purposes is to challenge practices that violate the separation of church and state. At the bottom of FFRF's stationery is the phrase, "protecting the constitutional principle of separation of state and church." That phrase appears to accurately describe the purpose of FFRF, and the eradication of religious instruction in public schools is germane to that purpose. Finally, this litigation is resolvable without the presence of either John Doe or Mary Roe. The central issues at the district court were legal; the record was sufficiently developed to resolve the legality of the protective order, the questions of standing, and whether the BEM classes violated the Establishment Clause.

Accordingly, all Plaintiffs have standing.

## C.  Establishment Clause

We review a district court's grant of a motion for summary judgment *de novo*. *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003). Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record, and all inferences that can be drawn from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Here, Plaintiffs contend that the BEM program is an unconstitutional establishment of religion because it fails the *Lemon* test. In *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), the Court set forth three factors to be considered when a violation of the Establishment Clause is alleged: (1) whether the government practice has a secular purpose; (2) whether the principal effect is one that either advances or inhibits religion; and (3) whether the practice fosters excessive government entanglement with religion. A statute or practice must conform to all three requirements to survive scrutiny under the Establishment Clause.

As to the first factor, the Board contends that BEM's teaching has a secular purpose: to teach character development, as required of all Tennessee public schools. *See* TENN. CODE ANN. § 49-6-1007(a). The Board argues that BEM's classes "focus [] on different value-driven themes, such as responsibility and courage, which serve [] to instill positive morals in students attending Rhea County schools." Even if we accept this as fact, the BEM classes also teach the Bible as religious truth. Several lesson plans from the 2000-2001 academic year are singularly religious. For example, the objective of one lesson plan for second graders is to "Teach the children God's commandments and that we should obey all of them." A subsequent lesson plan expressed a teacher's intention to "Teach them how God gives us the best and leads

us where He wants us to go." The lessons also seek to "teach the kids that God provides for us, even in the worst situations." Moreover, in explaining "How I Plan to Help Students See the Truth," one BEM teacher wrote, "Teach – 'Read your Bible[,] pray everyday.' 'Jesus loves you.' – (if acceptable)?" Such statements cannot be described as having a secular purpose.

As to the second factor, the central question in our endorsement inquiry is whether the BEM program communicates a message of government endorsement or disapproval of religion. To answer this question, we ask whether an objective observer, acquainted with the program, would view it as advancement or inhibition of religion. *Adland v. Russ*, 307 F.3d 471,484 (6th Cir. 2002). Viewing the BEM program in its specific context, an objective observer would conclude that it communicates a message of government endorsement of religion, generally, and of Christianity in particular. *Lee v. Weisman*, 505 U.S. 577, 627 (1992) (Souter, J., concurring) ("[T]he State may not favor or endorse either religion generally over nonreligion or one religion over others.") (citing *County of Allegheny v. ACLU*, 492 U.S. 573,589-94 (1989)).

Because the BEM program is conducted in public school classrooms, during school hours, and for children who are as young as kindergarten age, we must treat the objective observers as students in these classes. As the Supreme Court stated in *Lee*, "What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." 505 U.S. at 592.

As we explained above, the lesson plans here evidence an intention to teach the Bible as literal truth, and to draw from its narratives certain theological propositions. In a lesson plan for first graders, dated November 7, 2000, the lesson

objective was, "[To] reinforce how much God loves them [the students]; God wants to be their friend; You can be personal with God." In a lesson plan for first graders, a BEM instructor planned to "Teach the children that God created everything and teach them which days He created certain things." And in a lesson plan dated December 3, 2000, a BEM instructor stated, "[W]e will make sure that they know the true meaning of Christmas is. It was that God sent his son to the earth to be born as a baby; a baby who would [] one day die on the cross for our sins so that we can be saved. (We'll make sure to tell them this in a way that is ok – so we don't break any of the school rules)." The Board's justification of authorizing the BEM program as a component of its character development requirement ignores the overwhelmingly sectarian nature of the actual classes taught under its auspices.

While some of BEM's lesson plans evince an intention to train students in more secular aspects of character development, many, if not most, appear to have no secular component at all. Although the school system's oversight of BEM has been woefully derelict, its occurrence during the school day, and on school property sends a clear message of state endorsement of religion – Christianity in particular – to an objective observer.

Third, we ask whether BEM fosters an excessive entanglement between the state and religion. BEM takes place on school premises, during the school day, with the explicit sanction of the Board of Education. Moreover, the program's administration – which seems to have been left entirely in the hands of the students of Bryan College – creates a "grave potential for entanglement," *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 794 (1973), by delegating a governmental function to a religious institution. *See Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 121 (1982).

Deposition testimony by several officials from the Rhea County public schools and Bryan College confirms that the

school district abdicated its supervisory authority over the BEM classes. Elizabeth Brown – the principal of a public elementary school in Rhea County – testified that she did not know what was being taught in the BEM classes. Although Brown required and regularly reviewed lesson plans in other classes taught in the school, she admitted that she never saw, and never asked for, any lesson plan for any BEM class. Brown also testified that there had never been instructions from the Rhea County School Board on how the BEM classes were to be conducted. Similarly, John Mincy, the Chairman of the Rhea County School Board, admitted that he voted to continue the BEM classes in the public schools without knowing their content. When asked who determined the content of what Mincy, himself, called "the Bible class," he said, "I would say that Bryan College does." Mincy also stated that the Board had no written policy governing the BEM classes, and also acknowledged that he had never seen a policy manual describing the BEM classes.

The Rhea County School Board has ceded its supervisory authority over the BEM classes to Bryan College, which requires its students and faculty to subscribe to a sectarian statement of belief. The Supreme Court rejected such a practice in *Larkin*, which invalidated a Massachusetts statute that allowed churches to veto the issuance of liquor licenses within 500 feet of a church. *Id*. at 117. Indeed, the practices challenged in this action resemble paradigmatic cases of unconstitutional entanglement. *See Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 209-10 (1948) ("[T]he use of tax-supported property for religious instruction and the close cooperation between the school authorities and the religious council in promoting religious education . . . falls squarely under the ban of the First Amendment."); *Doe v. Human*, 725 F. Supp. 1503, 1504-1506, 1508 (W.D. Ark. 1989) (relying on *McCollum* to invalidate a program in which Catholic, Jewish and Protestant instructors came into classrooms during school hours to teach bible classes), *aff'd*., 923 F.2d 857 (8th Cir. 1990), *cert. denied*, 499 U.S. 922 (1991).

## D. Denial of Invitation to Establish Guidelines

Finally, the Board complains that the district court erred in enjoining the entire BEM program without articulating "legal guidelines for the structuring and teaching of [Bible study courses] and afford[ing] each party the opportunity, if they should so elect, to submit plans, policies, and curricula changes in accordance with such guidelines." (Appellants' Brief at 20). The provision of guidelines by a federal court would, however, amount to the rendering of an advisory opinion, a practice that is beyond our Article III authority. *United States Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993).

## E. Attorneys' Fees

Finally, the Board contends that the trial court granted to Plaintiffs an excessive award of attorneys' fees. We review a district court's determination regarding the award of attorneys' fees for abuse of discretion. *Paschal v. Flagstar Bank*, 297 F.3d 431, 433 (6th Cir. 2002). A district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an incorrect legal standard, or applies the law incorrectly. *Id.* at 434.

Although the Board acknowledges that the district court reduced Plaintiffs' requested award for attorneys' fees by $9,500 for what it deemed to be unnecessary travel time charged by Plaintiffs' attorneys and paralegals and further reduced the entire award by five percent, it argues that the latter reduction—imposed to compensate for what the district court considered to be a duplication of effort—should have been greater. The Board makes only one specific statement regarding duplication of services – regarding $4,600 in expenses related to travel on November 6, 2001. However, even here, it concedes that it is likely that at least some of the duplication was accounted for in the original fee reduction of $9,500. Without more specific arguments, we cannot say that this particular reduction amounted to an abuse of discretion.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment for Plaintiffs.