RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0209p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

D.E.,

*Plaintiff-Appellant,*

*v.*

JOHN DOE I; ROBERTA FIERY-REPIC; JOHN DOE II;
BRIDGET HILLARD; JOSEPH VITTORINI; ANDREW
BEAUDRY,

*Defendants-Appellees.*

No. 15-2128

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-10088—George C. Steeh, District Judge.

Decided and Filed:  August 25, 2016

Before:  KEITH, ROGERS, and SUTTON, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:**  Michael Ericksen, Huntington Woods, Michigan, for Appellant.  Brandon C.
Helms, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Federal Appellees.

ROGERS, J., delivered the opinion of the court in which SUTTON, J., joined, and
KEITH, J., joined in the result.  KEITH, J. (pp. 7–13) delivered a separate opinion concurring in
the judgment.

───────────────

**OPINION**

───────────────

ROGERS, Circuit Judge.  In June 2012, nineteen-year-old D.E. took a wrong turn on his

way to summer camp.  Instead of arriving at the camp in Michigan, he inadvertently ended up at

1

the international border with Canada.  When he told the toll-booth operator of his mistake, the operator directed him to turn around without crossing the border and to merge into a lane of traffic containing motorists arriving from Canada.  That lane of traffic funneled D.E. to a Customs and Border Protection ("CBP") inspection booth.  Despite his explanation that he had not crossed the border, CBP officers searched his vehicle and discovered marijuana and drug paraphernalia.  After pleading guilty to a misdemeanor charge in state court, D.E. brought the instant civil rights complaint against four CBP officers and two unidentified individuals, claiming that they violated his Fourth Amendment rights by detaining him and searching his car without cause.  Because a traveler's subjective intent not to leave the country does not provide an exception to the government's authority to conduct suspicionless searches of vehicles at the border, the district court did not err in dismissing D.E.'s suit.  D.E.'s remaining claims—that the district court abused its discretion in denying his Rule 59(e) motion for reconsideration and in denying his motion for a protective order—also lack merit.

According to D.E.'s complaint, when he inadvertently arrived at the Canadian border crossing at the Blue Water Bridge in Port Huron, Michigan, an unidentified toll-booth operator advised him that he could turn around without entering Canada.  The operator provided him with a laminated card, which was prepared by CBP and stated on the front:

> You are being allowed to turn around without traveling to Canada.  Please present this card, along with your identification to an open CBP inspection booth prior to departing.  Thank you.

The back of the card stated:

> All persons, baggage, and merchandise arriving in the Customs territory of the United States or from places outside thereof are liable to inspection and search by a Customs official.

The toll-booth operator instructed D.E. to merge into a lane of traffic containing motorists arriving from Canada and to proceed to a primary inspection booth.  At the primary inspection booth, Officer Fiery-Repic reviewed D.E.'s laminated card and license and directed him to proceed to a secondary inspection area.  An unidentified officer then escorted D.E. to the station house.  Meanwhile, Officer Hillard conducted a canine search of the car, and Officer Vittorini physically searched the car.  When Officer Vittorini opened the trunk of D.E.'s car,

Officer Hillard informed him that the dog had alerted on the backpack in the trunk. Officer Vittorini then searched the backpack and found marijuana and drug paraphernalia. Officer Vittorini entered the station house, handcuffed D.E., searched him, and detained him in a jail cell for about one hour until Port Huron police arrived to take him into custody. D.E. also alleges that CBP Supervisor Beaudry approved of the actions of the other defendants, failed to properly train them, and failed to prevent them from engaging in unlawful searches.

While the instant suit was pending, D.E. pled guilty in state court to misdemeanor possession of drug paraphernalia and was sentenced to one month probation pursuant to the Holmes Youthful Trainee Act ("HYTA"), Mich. Comp. Laws §§ 762.11–.16, *et seq*. Subsequently, the district court in this case granted the defendants' motion to dismiss, reasoning that the defendants did not violate D.E.'s Fourth Amendment rights, because routine searches at the border do not require a warrant, probable cause, or reasonable suspicion, and that the defendants are entitled to qualified immunity. D.E. moved for reconsideration pursuant to Federal Rule of Civil Procedure 59(e) and for a protective order to seal the record or redact his name from all filed documents. The district court denied the motion for reconsideration, concluding that D.E. had failed to identify a palpable defect in the proceedings or establish that correction of such a defect would result in a different disposition of the case. The district court also denied D.E.'s motion for a protective order, concluding that he failed to show compelling reasons to keep his identity secret. Finally, the district court denied D.E.'s motion for reconsideration of the order denying his motion for a protective order. On appeal, D.E. identifies nineteen issues for review. His primary challenge is to the district court's ruling that the defendants properly subjected him to a border search. He mainly argues that international travel is required for officers to conduct suspicionless searches at the border, and also argues that the district court failed to credit his allegations that the purpose of searching turnaround motorists is either to verify citizenship or to look for evidence of general criminal activity (purposes which he claims made the search of his vehicle illegal), that the defendants were not authorized to detain him after his citizenship was verified and after they determined that they would not bring federal charges against him, and that the suspicionless canine drug search was unlawful because possession of marijuana can be legal in Michigan in some circumstances. Additionally, he argues that the district court abused its discretion when it denied his motions for

reconsideration and for a protective order.  Finally, D.E. also filed a motion for a protective order in this court, which was denied without prejudice to reconsideration by this panel.

D.E. has not stated a claim upon which relief can be granted, because, accepting his factual allegations as true, the defendants' actions were lawful under the border-search exception to the Fourth Amendment's warrant and probable cause requirements.  Contrary to D.E.'s various arguments, routine searches of vehicles at the border do not require a warrant or any level of suspicion, *United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004), regardless of whether the motorist intends to cross the border or has arrived at the border area inadvertently, *United States v. Humphries*, 308 F. App'x 892, 896 (6th Cir. 2009).  That D.E. did not cross the border is irrelevant, as officers may conduct suspicionless searches on outbound persons and effects, which have not yet crossed the border, *see United States v. Boumelhem*, 339 F.3d 414, 420–23 (6th Cir. 2003).  That D.E. subjectively did not intend to cross the border is also irrelevant.  There is no reliable way for the CBP officers to tell the difference between a motorist who has just crossed the border or who intends to cross the border and a "turnaround motorist" who is at the border area by mistake.  It would be dangerous (and quite stupid) for CBP officers to assume that every traveler who claims to be there by mistake—or who possesses an easily fabricated laminated card—is telling the truth, especially considering that D.E.'s vehicle was in the same lane as motorists arriving from Canada.  CBP officers are not infallible lie detectors capable of correctly determining the subjective intent of travelers at the border.  Instead, because the "Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border," *Flores-Montano*, 541 U.S. at 152, officers may conduct suspicionless searches of vehicles at the border (or at its functional equivalent, *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973)) without regard to the reasons why motorists are at the border.

D.E.'s arguments to the contrary are without merit.  His reliance on *United States v. Ortiz*, 422 U.S. 891 (1975), is misplaced.  *Ortiz*, which held that officers may not search vehicles at traffic checkpoints removed from the border or its functional equivalent without consent or probable cause, *id.* at 896–97, does not constrain officers' ability to search vehicles that are, in fact, at the border or its functional equivalent.  Additionally, D.E.'s claim that the purpose of the

search was illegal misses the mark, as officers need no specific purpose or suspicion to search a vehicle at the border, *see Flores-Montano*, 541 U.S. at 152–53. Instead, "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). Nor was CBP's detention of D.E. unlawful. D.E.'s detention for roughly one hour was reasonable, given that "delays of one to two hours at international borders are to be expected," *Flores-Montano*, 541 U.S. at 155 n.3, and that the detention was for the sole purpose of waiting for local law enforcement to take custody of D.E. after marijuana and drug paraphernalia had been discovered. Furthermore, the fact that marijuana can be legally possessed in Michigan in some circumstances—which were not the circumstances under which D.E. possessed it—has no bearing on whether the CBP officers could conduct a suspicionless canine sniff on a vehicle stopped at the border. A canine sniff is not a constitutionally cognizable infringement under the Fourth Amendment when conducted during a lawful traffic stop, *see Illinois v. Caballes*, 543 U.S. 405, 409–10 (2005), and, even if it were, as explained above, both the stop and the search of D.E.'s vehicle were lawful under the border-search exception. Finally, contrary to D.E.'s arguments, the CBP officers had statutory authority to conduct a suspicionless border search on his vehicle pursuant to 19 U.S.C. § 1581(a), which grants general authorization for border searches of vehicles, *see Boumelhem*, 339 F.3d at 419–20.

Additionally, the district court did not abuse its discretion when it denied D.E.'s Rule 59(e) motion. A Rule 59(e) motion must present newly discovered evidence or clearly establish a manifest error of law. *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir. 2007). D.E. did not present any newly discovered evidence. Nor did he present any persuasive arguments establishing a manifest error of law. D.E. argued in his motion that the district court did not address some of the arguments he presented or accept as true his allegations regarding CBP's programmatic purpose in stopping turnaround motorists. However, in denying his motion for reconsideration, the district court explained that, although it did not specifically discuss each of the arguments he asserted in his lengthy brief, it did consider them when concluding that his claims lacked merit.

Lastly, the district court did not abuse its discretion when it denied D.E.'s motion for a protective order. As a general matter, a complaint must state the names of all parties. Fed. R. Civ. P. 10(a); *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004). Under certain circumstances, however, the district court may allow a plaintiff to proceed under a pseudonym by granting a protective order. *Porter*, 370 F.3d at 560. D.E. sought such a protective order, arguing that anonymity would further the objectives of Michigan's HYTA program under which he pled guilty. Under HYTA, which is aimed at helping young people avoid the stigma of a criminal record resulting from an immature act or decision, all proceedings regarding the criminal charge are closed to public inspection. *See* Mich. Comp. Laws § 762.14(4). He also argued that a public record revealing his name in this case would subject him to negative scrutiny from prospective future employers. In determining whether to grant such an order, district courts consider: (1) whether the plaintiff is suing to challenge governmental activity; (2) whether prosecution of the suit will compel the plaintiff to disclose information "of the utmost intimacy"; (3) whether the litigation compels plaintiff to disclose an intention to violate the law, thereby risking criminal prosecution; and (4) whether the plaintiff is a child. *Porter*, 370 F.3d at 560 (citing *Doe v. Stegall*, 653 F.2d 180, 185–86 (5th Cir. 1981)).

The district court did not abuse its discretion in denying D.E.'s motion for a protective order, because he did not articulate concerns that outweigh the presumption of openness in judicial proceedings. The prosecution of D.E.'s claims did not require him to disclose information "of the utmost intimacy" or compel him to disclose any intent to violate the law, nor was he a child when he filed this lawsuit. As for potential negative scrutiny from future employers, D.E., as the district court explained, "forfeited his ability to keep secret his actions at the international border . . . when he sued United States Customs and Border Patrol agents." The district court also did not abuse its discretion when it denied his motion for reconsideration, because D.E. did not present newly discovered evidence in support of his motion or demonstrate a manifest error of law. For these same reasons, we decline to reconsider our prior order denying D.E.'s motion filed in this court for a protective order. However, in the exercise of our discretion, in this published opinion we refer to D.E. by his initials.

For the foregoing reasons, the judgment of the district court is affirmed.

---

**CONCURRENCE IN THE JUDGMENT**

---

DAMON J. KEITH, Circuit Judge, concurring in the judgment.  I cannot join the majority's interpretation of the Fourth Amendment.  In holding that Customs and Border Protection ("CBP") officers may, without reasonable suspicion, search individuals who are not in the process of crossing an international border, the majority stretches the "border search" exception to its breaking point.

### A.  Application of the Border Search Exception Must be Tethered to the Primary Purpose of the Exception

"A search without a warrant is 'per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions.'"  *United States v. Boumelhem*, 339 F.3d 414, 420 (6th Cir. 2003) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "The border search exception generally provides that routine searches of the persons and effects of [those who enter the country from another country] are not subject to any requirement of reasonable suspicion, probable cause, or warrant."  *Id.*

The primary purpose for this exception is to allow the government to invoke its "longstanding right . . . to protect itself by stopping and examining persons and property crossing into this country."  *See United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).  In *Boumelhem*, we recognized that this exception applies equally to those who are exiting the country.  *Boumelhem*, 339 F.3d at 422 (concluding that "the United States's interest in preventing the export of weapons to other countries also implicates the sovereign's interest in protecting itself").  The application of the border search exception "must remain tethered to its primary purpose."  *United States v. Humphries*, 308 F. App'x 892, 896, n.1 (6th Cir. 2009).

As the Supreme Court has recognized, "[b]order searches . . . have been considered to be 'reasonable' *by the single fact that* the person or item in question had *entered into our country from the outside*."  *United States v. Ramsey*, 431 U.S. 606, 619 (1977) (emphasis added).

At least eight other circuits have also recognized this fact. *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) ("[R]outine border searches of a person's belongings are made reasonable by that person's decision to enter this country."); *United States v. Cortez-Rocha*, 394 F.3d 1115, 1118-119 (9th Cir. 2004) ("Border searches . . . have been considered to be reasonable by the single fact that the person or item in question had entered into our country from outside."); *United States v. Oriakhi*, 57 F.3d 1290, 1295 (4th Cir. 1995) (same); *United States v. Victoria-Peguero*, 920 F.2d 77, 79 (1st Cir. 1990) (same); *United States v. Jackson*, 825 F.2d 853, 858 (5th Cir. 1987) (same); *United States v. Mayer*, 818 F.2d 725, 727 (10th Cir. 1987) (same); *United States v. Glasser*, 750 F.2d 1197, 1201 (3d Cir. 1984) (same); *United States v. Garcia*, 672 F.2d 1349, 1354 (11th Cir. 1982) (same).

**B.      Person or Item to be Searched Must Have Crossed, or be in the Process of Crossing, an International Border**

In order for a warrantless, suspicionless search at the border to be deemed "reasonable," the item or person to be searched must actually cross the border or be in the process of doing so. *See, e.g.*, *Ramsey*, 431 U.S. at 620 (noting that "[t]he *critical fact* is that [the items to be searched] *cross the border* and enter this country . . . . It is their entry into this country from without it that *makes a resulting search 'reasonable'*") (emphasis added); *Boumelhem*, 339 F.3d at 423 (noting that border searches on exiting vehicles are reasonable by virtue of the fact that *persons exiting the country* "undoubtedly have a lesser expectation of privacy when they (or their goods) leave the country if for no other reason than the departure from the United States is almost invariably followed by entry into another country") (emphasis added); *see also United States v. Delgado*, 810 F.2d 480, 483 (5th Cir. 1987) ("Regardless of the type of [border] search involved, the fact that a border crossing occurred must be demonstrated."); *United States v. Garcia*, 672 F.2d 1349, 1357 (11th Cir. 1982) (concluding that the "point of origin has no bearing on the reasonableness of a [border] search so long as a border crossing has been established"). Here, the Government does not dispute that D.E. did not cross the border and was not in the process of crossing the border when his vehicle was searched.

**C.      Reasonable Suspicion Was Required for the Search of D.E.'s vehicle**

When CBP officials seek to search an item or person on the basis of general "contact with the border area," without evidence that the item or person has crossed the border or is in the process of crossing, reasonable suspicion is required.  *United States v. Glaziou*, 402 F.2d 8, 13-14 (2d Cir. 1968), *cert denied*, 393 U.S. 1121 (1969) (holding that persons who have "direct contact with a border area" or whose movements are "reasonably related to the border area" are not subject to search absent suspicion); *United States v. McGlone*, 394 F.2d 75, 78 (4th Cir. 1968) (noting that when a crossing does not occur, "[t]he validity of the search usually depends upon whether all the facts establish reasonable cause to suspect that merchandise presently is being illegally introduced into the United States by the person the officer proposes to search").

Here, D.E. was given a card—while he was in a border area—that said he was "being allowed to turn around without traveling to Canada."  The government acknowledges that he did in fact turn around without traveling to Canada.  Yet, the government does not assert any factors supporting reasonable suspicion to search D.E.'s vehicle; indeed, it argues that reasonable suspicion was not required.  But because D.E. did not cross the border and was not in the process of crossing the border, reasonable suspicion was required for the search of D.E's vehicle.[1]

**D.      Difficulty in Complying with the Dictates of the Constitution is Not a Free Pass to Not Comply**

The majority asserts that it is difficult for CBP officers to tell the difference between the motorist who has actually crossed the border and the motorist who was allowed to turn around because both such motorists are funneled into the same line.  The majority also states that the laminated card from the CBP officers given to D.E., stating that he was being allowed to turn around without crossing the border, is not reliable because the card can be fabricated.  The majority loses the forest for the trees.

For starters, difficulty in complying with the dictates of the United States Constitution is not a free pass to not comply.  While we ascertain the "reasonableness" of Fourth Amendment

---

[1]Even assessing the totality of the circumstances for reasonable suspicion, no such suspicion existed here. Making a U-turn in order to avoid a border checkpoint is not by itself enough to establish reasonable suspicion for a border search.  *See United States v. Montero-Camargo*, 208 F.3d 1122, 1137 (9th Cir. 2000) (noting that "a turnaround alone is not enough in and of itself to create reasonable suspicion").

intrusions, that "reasonableness" does not turn on convenience or ease. *Cf. United States v. Ogbuh*, 982 F.2d 1000, 1004 (6th Cir. 1993) ("Delay due to any difficulty in locating an Assistant U.S. Attorney to approve the warrant request does not excuse abrogation of the requirements of the Fourth Amendment.").

Second, the so-called difficulties in distinguishing between turnaround motorists and motorists who are actually crossing the border are created by the CBP. The CBP *chooses* to comingle non-crossing motorists with crossing motorists, such that it is difficult to discern the difference between the two. The CBP *chooses* to use a laminated card that can be easily fabricated.[2] The CBP cannot erect a procedurally flawed system, and then use it as an excuse for not complying with the Fourth Amendment. *See id.* ("[T]he government may not erect a system of procedural delay and then use it as an excuse for not obtaining a warrant.").

Further, the majority's assertion that CBP officials are not lie detectors and therefore cannot discern which motorists crossed the border is unavailing. To begin, it is not for this court to fashion a way for the CBP officials to comply with the Fourth Amendment. Nevertheless, a plausible alternative proves fatal to the majority's "lie detector" justification. For example, it is possible for the CBP officials to communicate with one another regarding motorists who were permitted to turn around. Indeed, aside from the "easily fabricated" laminated card, these motorists have other readily identifiable features: the make and model of their vehicle, their unique license plate number, and/or their driver identification information.[3] Such officials generally have no difficulty in using various modes of communication when they are alerting each other that someone or something *should* be seized or searched. Nevertheless, it is not our place to tell the CBP officials what practice to adopt, but it is our place—and indeed our duty—to safeguard the constitutional rights of citizens when that practice falls short of the dictates of the Fourth Amendment.

---

[2]And notably these days, there are few things, including passports and identification cards, that cannot be fabricated. It would be a slippery slope if courts started to deem unreasonable intrusions to be "reasonable" because of the possibility of document fabrication.

[3]The government did not assert any difficulties in monitoring these turnaround vehicles to make sure they actually turned around.

**E.     Reliance on *Humphries* Misplaced**

The majority's reliance upon our non-binding, unpublished decision in *United States v. Humphries*, 308 F. App'x 892, 896 (6th Cir. 2009) is unavailing for a number of reasons. First, the motorist in *Humphries* was, from all objective appearances, on his way out of the country at the time of the search. *See id.* at 893 (noting that Humphries was in the direction of outgoing traffic and was "right next to the station where cars are inspected before entering the tunnel" to go to Canada). An officer testified that cars arriving "in that position" have "made somewhat of a commitment to go to Canada." *Id.*

The *Humphries* court appreciated that, regardless of Humphries' statements about his intent, he was in a position to exit the country. *Id.* at 896 n.1 (explaining that the court was dealing with a "possible exit from the country"). Accordingly, Humphries' situation was covered by our rationale in *Boumelhem* because, from all objective appearances, Humphries was in the process of crossing the border. *See id.* at 896.

In contrast, when D.E. was searched, he was not in a position to cross the border. D.E. was in the line of cars heading into the United States, positioned away from Canada, and it is undisputed that he had not crossed into Canada, and was not in the process of crossing into Canada. At that point, it is of no moment whether or not he had initially intended to cross the border—the reality is that he did not and could not from such a position. Unlike in *Humphries*, here we are not dealing with a "possible exit from the country." Unlike in *Humphries*, cars in the position of D.E.'s vehicle have not "made somewhat of a commitment to go to Canada." Indeed, cars in his position have made somewhat of a commitment *not* to go to Canada. Therefore, I believe *Humphries* is too factually inapposite to provide much persuasive guidance in this case.

Indeed, other than its misplaced reliance on *Humphries*, the majority does not cite any case in this country, binding or otherwise, holding that a turnaround motorist who is not in the process of crossing the border is subject to search at the border absent reasonable suspicion. Nor am I aware of such a case.

The border search exception "is *grounded* in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter

the country." *Ramsey*, 431 U.S. at 620 (emphasis added). By extending this exception to the situation presented here, the majority uproots this exception from its well-grounded foundation. "If police have little incentive to [comply with the Fourth Amendment,] they will not do so. The law must provide that incentive; otherwise, the warrant requirement of the Fourth Amendment will become a dead letter." *Ogbuh*, 982 F.2d at 1004. Today, yielding to the government's complaints that compliance is too difficult, the majority assists the CBP in burying the Fourth Amendment. I cannot concur in that position.

### F.      Constitutional Right Not Clearly Established

Nevertheless, because the matter before us is a civil suit alleging violations of D.E.'s civil rights under § 1983, the officials are entitled to qualified immunity unless D.E. can establish (1) that his constitutional rights were violated, and (2) that the right was clearly established at the time of the violation. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). For the reasons above, I would hold that D.E.'s constitutional rights were violated. I turn, then, to examining whether that right was clearly established at the time of the violation.

To be clearly established, "the contours of the right must be sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Coley v. Lucas County, Ohio*, 799 F.3d 530, 539-40 (6th Cir. 2015). "Rights are not clearly established unless either a precedent squarely governs the outcome of the case or the case is [entirely] obvious." *Libretti v. Woodson*, 600 F. App'x 367, 370-71 (6th Cir. 2015) (internal quotation marks omitted). "The inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Coley*, 799 F.3d at 540 (internal quotation marks and citation omitted). However, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "To resolve this question, this Court 'must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 788 (6th Cir. 2012) (citation omitted).

While I am inclined to conclude that the right was clearly established, three other judges (the two on this panel, and the district court judge) have concluded—for whatever reason—that

our unpublished decision in *Humphries* can be read as sanctioning the conduct in this case. While I disagree for the reasons explained above, *Humphries'* supposed muddling of the waters in this area compels me to conclude that it less likely that a reasonable official would have known that his conduct violated a clearly established right. *See Sheets v. Moore*, 97 F.3d 164, 168 (6th Cir. 1996) ("If federal district judges could reasonably disagree over the constitutionality of the regulation, then it can fairly be said that a reasonable official would not have known that his conduct violated a clearly established right."). Therefore, I concur in the judgment of the majority to dismiss D.E.'s civil rights complaint.

* * *

I am deeply troubled that the CBP has established a pattern and practice of violating the Fourth Amendment. Direct evidence of this practice is the laminated card. The laminated card provided by the CBP states that the person receiving the laminated card is being allowed to turn around without crossing the border. The same card also states that the person (and his or her belongings) are still subject to search by a customs official. This card is written evidence that the CBP has a practice of searching persons and items that have not and will not cross an international border *without probable cause and without reasonable suspicion*. Because the "single fact" that makes border searches reasonable—i.e. a border crossing—is completely absent under those circumstances, the CBP's practice cannot pass constitutional muster. *Ramsey*, 431 U.S. at 619 ("[b]order searches . . . have been considered to be 'reasonable' *by the single fact that* the person or item in question had *entered into our country from the outside*") (emphasis added); *Id.* (noting that the government's power to exclude contraband "can be effectuated by routine inspections and searches of individuals or conveyances *seeking to cross our borders*") (emphasis added). I am even more troubled by the majority's choice to rubberstamp this conduct. I am concerned that if government officials can escape the bounds of the U.S. Constitution by simply forming their lips to say compliance is too difficult, eventually there will be little left of a Constitution to protect, much less a society unburdened by unreasonable intrusions.